## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LAUREN EMMELL,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | |
| | : | **NO. 16-3787** |
| **PHOENIXVILLE HOSPITAL** | : | |
| **COMPANY, LLC,** | : | |
| | : | |
| **Defendant.** | : | |

## M E M O R A N D U M

**STENGEL, C.J.**                                          **March 29, 2018**

### I.    INTRODUCTION

The plaintiff, Lauren Emmell, brought this employment discrimination action against her former employer, Phoenixville Hospital, where she worked as a nurse. She brings her claims under the Family and Medical Leave Act (FMLA), the Americans with Disabilities Act (ADA), and the Pennsylvania Human Relations Act (PHRA). Defendant Phoenixville Hospital moved for summary judgment. For the reasons that follow, I will grant summary judgment with respect to the plaintiff's FMLA claims (Counts I and II of her amended complaint), and I will deny summary judgment with respect to the plaintiff's ADA and PHRA claims (Counts III and IV).

1

## I.   BACKGROUND[1]

Plaintiff Lauren Emmell began working as a nurse for Phoenixville Hospital in February 1988. (Doc. No. 29 ¶¶ 1, 2.) In January 2007, after working in other departments, she began working in the short procedure unit (SPU), where her responsibilities included preoperative and postoperative patient care. (Id. ¶¶ 2, 3.)

The plaintiff's direct supervisor during the relevant time period was Mary Tannouri, who became the hospital's Perioperative & Endoscopy Clinical Nurse Manager and began overseeing the SPU in February 2008. (Id. ¶¶ 7, 8.) The SPU nurse coordinator, Rosie Bucci, oversaw staffing, management of patient flow, and assigning of nurses to various tasks. (Id. ¶ 9.)

### A.  *Plaintiff's May 2010 Performance Evaluation*

In Ms. Tannouri's May 18, 2010 evaluation of Ms. Emmell, she noted that the plaintiff needed "further development" in the category titled "[d]evelops and maintains collaborative relationship with others" because the plaintiff "was not working up to the same capacity [as others]." (Id. ¶ 10, Ex. D.)

---

[1] This statement of facts is ordered chronologically and is condensed from the following sources, except where noted otherwise: the defendant's statement of undisputed material facts (Doc. No. 29), the plaintiff's response to defendant's statement of undisputed material facts (Doc. No. 33), and the plaintiff's counterstatement of undisputed material facts (designated in this opinion as Doc. No. 33a for clarity because it is contained within Doc. No. 33).

## B. Plaintiff's May 2011 Performance Evaluation

In the plaintiff's May 17, 2011 performance evaluation, Ms. Tannouri "noted that the plaintiff did 'not share [patient] load or rotating shifts'" and observed that she "was not 'work[ing] up to the same capacity as her colleagues.'" (Id. ¶ 15.) The defendant states that the plaintiff took longer than her colleagues to carry out tasks because she liked to chat with patients, while the plaintiff states that her slow pace stemmed from symptoms of her Lyme disease. (Id. ¶ 17; Doc. No. 33 ¶ 17.)

In this 2011 evaluation, Ms. Tannouri rated Ms. Emmell as "Needs Improvement" in the following categories:

- "Serves as a model for professional behavior"
- "Facilitates the development of an effective team"
- "Works as a team player, supporting and assisting team members"
- "Maintains effective working relationships with physicians, department heads, patient [sic], visitors, and coworkers. Interacts with all customers in a pleasant and respectful manner, displays courtesy at all times"
- "Has received no [staff] complaints regarding attitude or performance"
- "Maintains a positive attitude and is willing to go the 'extra' mile"

(Doc. No. 29 ¶ 21.)

Ms. Tannouri's evaluation concluded that Ms. Emmell "was not meeting the expectations of a Clinical Level III nurse in the SPU because she lacked 'the ability to see what was going on in the department,'" and Ms. Tannouri placed her on a performance improvement plan (PIP). (Doc. No. 29 ¶ 22.)

### C. Plaintiff's 2011 Performance Improvement Plan

Ms. Emmell was placed on the 2011 PIP for 90 days, starting June 17, 2011. (Doc. No. 33 ¶ 23.) This PIP required her to spend less time admitting patients, to become "more globally aware" of when her colleagues needed assistance, and to "participate, equitably, in staff scheduling rotation, as needed." (Doc. No. 29 ¶ 23.)

### D. Plaintiff's 2012 Performance Evaluation

Ms. Emmell received her 2012 performance evaluation on June 18, 2012 and then completed a self-evaluation before meeting with Ms. Tannouri later the same day. (Id. ¶¶ 25–26.) The plaintiff rated herself as "Needs Improvement" in the following categories:

- "Works as a team player, supporting and assisting team members"
- "Completes duties during the shift with few exceptions. Coordinates work to achieve maximum productivity"
- "Maintains effective working relationships with physicians, department heads, patient [sic], visitors, and coworkers. Interacts with all customers in a pleasant and respectful manner, displays courtesy at all times"
- "Has received no [staff] complaints regarding attitude or performance"

(Id. ¶ 27.)

At their meeting, Ms. Tannouri shared concerns "regarding Plaintiff's time management skills, productivity, and her 'global awareness'"—similar concerns to previous years. (Id. ¶ 28.) Additionally, Ms. Tannouri noted that the plaintiff continued taking too much time to admit patients and that her global awareness

had not improved from the previous year. (Id. ¶ 29.) Ms. Tannouri placed Ms. Emmell on a second PIP. (Id. ¶ 30.)

### E. Plaintiff's 2012 FMLA Leave

During their June 18, 2012 meeting, the plaintiff explained that she had not been feeling well, and Ms. Tannouri recommended that she take a medical leave of absence. (Id. ¶ 33.) The plaintiff explained that her medical issues may have caused her slowness at work. (Doc. No. 33 ¶ 33.) This was the first time she shared her health concerns with Ms. Tannouri, and she had not yet received a diagnosis. (Doc. No. 29 ¶¶ 34, 35.)

The plaintiff requested, was granted, and took FMLA leave from June 25, 2012 through August 7, 2012. (Id. ¶ 31.) Before she returned to work, Ms. Emmell's physicians "certified that they were familiar with Plaintiff's job duties, that she was fit for duty, and that she could perform her duties without restriction." (Id. ¶ 36; Doc. No. 33 ¶ 36.) She received her 2012 PIP upon her return. (Doc. No. 29 ¶ 32.)

### F. Plaintiff's Lyme Disease Diagnosis

On June 28, 2012, Dr. Philip Adelman treated Ms. Emmell for "diffuse pain." (Doc. No. 33a ¶ 1.) "Dr. Adelman 'noted that Plaintiff was experiencing 'crushing headaches' and had [a] 'near syncopal episode' at work." (Id.)

The plaintiff received positive test results for Lyme disease on August 14, 2012, about a week after returning to work from FMLA leave. (Doc. No. 29 ¶ 37.) She informed Ms. Tannouri of her diagnosis. (Id. ¶ 38.) The defendant states that Ms. Tannouri asked, "[a]re you better," and said, "thanks for telling me." (Id. ¶ 39.) The plaintiff disputes that Ms. Tannouri thanked her and notes that she considered it inappropriate for Ms. Tannouri to ask, "[a]re you better?" (Doc. No. 33 ¶¶ 39, 41.)

### G. Plaintiff's 2012 Performance Improvement Plan

Plaintiff's 2012 PIP required her to complete admissions within 20–25 minutes and, to that end, to multitask and eliminate unnecessary conversation with patients. (Doc. No. 29 ¶ 44.) Similar to her 2011 PIP, the plaintiff was expected to become more globally aware of her surroundings, to help when appropriate without being asked, and to "take multi-patient assignments, without being asked." (Id. ¶¶ 45, 46.) Along with her 2012 PIP, Ms. Emmell received a "Second Written Warning" detailing the "exact same concerns and corrective actions" contained in the 2011 and 2012 performance evaluations and PIPs. (Id. ¶ 49.)

On September 13, 2012, Ms. Tannouri amended the 2012 PIP by adding a "Daily Tracking Log" for plaintiff to monitor her progress. (Id. ¶ 51.) During a meeting on September 21, 2012, Ms. Tannouri explained that Ms. Bucci (who was also present) would delegate some of her patient care to the plaintiff so that Ms.

Bucci could spend more time observing, advising, and directing the plaintiff. (Id. ¶¶ 55, 56; Doc. No. 33 ¶¶ 55, 56.).

## H. Plaintiff's Impairment

During their September 13, 2012 meeting, when Ms. Tannouri amended the 2012 PIP, Ms. Emmell informed Ms. Tannouri that she may have a cognitive impairment due to her Lyme disease. (Id. ¶ 63.) Ms. Tannouri consulted with human resources, and on September 21, 2012, she explained that Ms. Emmell would need to "see her treating physician and return a completed fitness for duty certificate" indicating that she could safely perform her work. (Id. ¶ 66.) On September 24, 2012, Ms. Emmell returned a completed certificate from her physician, Dr. Adelman, and returned to work the next day. (Id. ¶ 67; Doc. No. 33a ¶ 3.)

## I. Plaintiff's Third Written Warning

On January 28, 2013, the plaintiff received a "Third Written Warning" for substandard work. (Id. ¶ 68.) Ms. Tannouri had observed the same ongoing problems, including the plaintiff's "same poor work performance, including failing to be globally aware of what was going on in the SPU, resulting in her coworkers needing to assume more of the SPU's workload." (Id. ¶ 69.) This warning called for "[i]mmediate and sustained improvement," and the plaintiff signed it "without comment or explanation." (Id. ¶¶ 70, 71 (alteration in original).)

The parties disagree as to whether Ms. Emmell asked Ms. Tannouri for accommodations as a result of her Lyme disease. The defendant states that the plaintiff "never asked Ms. Tannouri for any changes to her work environment or the way she was doing her job or anything about her work." (Id. ¶ 72.) The plaintiff states that she "was informed by her neurologist that stress could exacerbate her symptoms," that she "told Ms. Tannouri that her work performance would improve if it were not for the stress caused by the terms of the PIP," and that she and Ms. Tannouri conversed about her work environment impacting her medical condition. (Doc. No. 33 ¶ 72.)

### J. *Plaintiff Leaves Work for Appointment*

On April 17, 2013, the plaintiff left work to attend a doctor's appointment in a building adjacent to the hospital; the appointment related to her Lyme disease. (Doc. No. 29 ¶ 73; Doc No. 33a ¶ 31.) She had scheduled the appointment for her lunch break, had informed Ms. Bucci earlier that day, was on intermittent FMLA leave at the time, and had another nurse cover her patient. (Id. ¶ 74; Doc. No. 33 ¶¶ 73, 74; Doc. No. 33a ¶¶ 21, 30.) She did not clock out when she left; the plaintiff states that lunch breaks were "automatically deducted from employees' time sheets." (Doc. No. 29 ¶ 75; Doc. No. 33 ¶ 75.)

Ms. Emmell received a "Final Written Warning" on April 18, 2013 for leaving the SPU to attend her appointment. (Doc. No. 29 ¶ 81.) Ms. Emmell noted

on the warning that the appointment was related to her "FMLA leave Lyme disease" and that she notified Ms. Bucci earlier that day. (Doc. No. 33a ¶ 37.)

The hospital has a policy requiring employees to clock out whenever they leave the premises. (Doc. No. 29 ¶ 77.) But the parties disagree as to whether the adjacent medical building, connected to the hospital by a pedestrian bridge, qualifies as off the premises. (Id. ¶ 77; Doc. No. 33 ¶¶ 77, 81.)

The parties further disagree over hospital policy regarding leaving for appointments. The defendant states that SPU nurses must inform Ms. Tannouri in advance of such an appointment so that she can assign appropriate coverage—and that informing Ms. Bucci was "insufficient to receive permission to leave the SPU." (Doc. No. 29 ¶¶ 79, 80.) The plaintiff states that according to Ms. Chiolo, the director of nursing, "nurses were expected to inform 'their manager [Ms. Tannouri] or coordinator [Ms. Bucci].'" (Doc. No. 33 ¶ 80.)

### K.  Plaintiff Requests Transfer

On May 17, 2013, Ms. Emmell requested a transfer from the SPU to a position as a "Clinical Document Specialist," where nurses review medical records and do not provide direct patient care. (Doc. No. 33a ¶ 39.) Ms. Tannouri replied that she was not eligible for transfer because she was on a PIP. (Id. ¶ 40.)

### L.  Plaintiff's 2013 Performance Evaluation

Ms. Emmell received her 2013 performance evaluation on June 25, 2013. (Doc. No. 29 ¶ 82.) It rated her as "'Needs Improvement' (*i.e.*, 2 out of 5) [and] noted the same performance deficiencies Plaintiff had been exhibiting since 2010." (Id. ¶ 87.) In it, Ms. Tannouri noted that Ms. Emmell "did not begin to perform, at an acceptable level, until she received a Third Written Warning, in January 2013, and was informed her job was in jeopardy, if immediate and sustained improvement did not occur." (Id.) The plaintiff states that she "previously performed at an acceptable level as she successfully completed the terms of her 2011 and 2012 PIPs." (Doc. No. 33 ¶ 88.)

The defendant avers that the plaintiff did not ask for changes to her job duties in June 2013. (Doc. No. 29 ¶ 92.) However, the plaintiff disputes this, noting her meeting with Ms. Strzelecki after her June 2013 evaluation. (Doc. No. 33 ¶ 92; Doc. No. 33a ¶ 42.) "Plaintiff met with Sally Strzelecki and complained about how Ms. Tannouri was handling her work performance issues and to discuss whether Ms. Strzelecki thought Ms. Tannouri 'was appropriate and accommodating' to someone who had Lyme disease. Plaintiff also requested that she been [sic] transferred to a different unit within the hospital" notwithstanding the hospital policy against transferring employees on PIPs. (Doc. No. 33 ¶ 92; Doc. No. 33a ¶ 45.) In this meeting with Ms. Strzelecki, the plaintiff explained that because of her illness, she was struggling to meet Ms. Tannouri's demands. (Doc. No. 33a ¶ 44.)

### M. Plaintiff Applies for Intermittent FMLA Leave

On June 26, 2013, the day after receiving her 2013 performance evaluation, the plaintiff applied for and was granted intermittent FMLA leave (by FMLASource, the hospital's third party FMLA administrator). (Doc. No 29 ¶ 94.) The letter that the plaintiff received from FMLA Source is dated July 9, 2013, and it grants intermittent leave from June 25, 2013 through June 24, 2014. (Id. Ex. V.) The letter explains that intermittent FMLA leave "allows eligible employees up to a total of 12 weeks of unpaid leave in a 12-month period for certain qualifying reasons." (Id.)

### N. Plaintiff's Employment is Terminated

On July 2, 2013, the plaintiff was working in the post-procedure side of the SPU. (Id. ¶ 98.) This required her to "monitor and care for patients as they revive from anesthesia and prepare to return home." (Id.) At about 1:45 p.m., the plaintiff "felt 'punky,' like she had 'low blood sugar,' from not having eaten during her shift." (Id. ¶ 99.) She felt she "could not 'do anymore without eating.'" (Doc. No. 33 ¶ 99.) Her coworker, Julia O'Donnell, relieved her for lunch, and Ms. Emmell gave Ms. O'Donnell a "disorganized and lengthy (20 minutes) report" with "much extraneous information." (Doc. No. 29 ¶ 101.) The plaintiff states that the report "was disorganized because she 'was feeling very poorly' and that she told Ms. O'Donnell that her report was disorganized" when she gave it to her. (Doc. No. 33 ¶ 101.)

When Ms. O'Donnell reviewed the chart of "a general surgical outpatient (Patient A)," she found that the plaintiff had not documented "vital signs or admissions notes." (Doc. No. 29 ¶ 103.) For a post-cardiac catheterization patient (Patient B), Ms. Emmell had told Ms. O'Donnell that the patient (admitted 45 minutes earlier) was awaiting his lunch and had "stable" vital signs—but Ms. O'Donnell could not find documented vital signs and could not find entries for Patient B on the "monitor that takes, records, and maintains patient vital signs." (Id. ¶¶ 104, 105.) Additionally, Ms. O'Donnell found that the plaintiff "had not recorded notes of her interactions with Patient B" in the chart upon the patient's admission. (Id. ¶ 106.)

"Upon returning from lunch, Plaintiff wrote several timed notes on Patients A and B as if she had completed them in real time." (Id. ¶ 107.) The plaintiff states that it was her practice when she had multiple patients to take contemporaneous notes of patients' vitals on a piece of paper, then record them later. (Doc. No. 33 ¶ 107.) Ms. O'Donnell was concerned that Patient B's vitals were never recorded by Ms. Emmell, and when she returned to work at 6 a.m. the next morning, she asked Ms. Bucci to assist her in reviewing the patient's chart. (Doc. No. 29 ¶¶ 108, 109.) Ms. O'Donnell and Ms. Bucci found that the vital signs for the time Ms. Emmell cared for the patient remained missing. (Id. ¶ 110.)[2]

---

[2] The plaintiff argues that the facts stated in this and the previous paragraph (taken from Doc. No. 29 ¶¶ 103–110) are inadmissible hearsay. (Doc. No. 33 ¶ 103–110.)

According to the defendant, when Ms. Emmell arrived at work on July 3, 2013, after Ms. O'Donnell and Ms. Bucci examined the chart of Patient B, "[Ms. Emmell] documented notes on patient care as though they had been made the day before, not as late entries or addendums." (Doc. No. 29 ¶ 111.) The plaintiff stated that she cannot recall the specifics of that day but that she would often take contemporaneous notes and properly record them later. (Doc. No. 33 ¶ 111.) Ms. O'Donnell shared her concerns about Ms. Emmell's charting with Ms. Tannouri. (Doc. No. 29 ¶ 112.) On July 12, 2013, the plaintiffs' employment was terminated by Ms. Tannouri, in consultation with Ms. Strzelecki. (Id. ¶ 115.)

## II. PROCEDURAL HISTORY

On January 2, 2014, the plaintiff dually filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the Pennsylvania Human Relations Commission (PHRC), and she was issued a right to sue letter on July 22, 2016. (Doc. No. 10 ¶ 13.) She timely filed her complaint in this court on July 12, 2016 (Doc. No. 1) and her amended complaint on October 27, 2016 (Doc. No. 10). Phoenixville Hospital filed its answer to the amended complaint on December 1, 2016. (Doc. No. 14.) The hospital moved for summary judgment on August 14, 2017. (Doc. No. 28.) The motion was followed by the plaintiff's response, the defendant's reply, and the plaintiff's surreply. (Doc. Nos. 34, 37, 40.) The matter is now ripe for decision.

## III.    LEGAL STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it would affect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A disputed issue is "genuine" if it would allow a reasonable fact-finder to return a verdict in favor of the nonmoving party. Id. Summary judgment is appropriate when the nonmoving party fails to provide evidence "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The party seeking summary judgment must inform the court of the basis for its motion and identify the portions of the record that demonstrate "the absence of a genuine issue of material fact." Id. at 323. Relevant portions of the record include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). Alternatively, the moving party can show "that the materials cited [by the nonmoving party] do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Id.

When determining whether to grant summary judgment, a court must draw "all justifiable inferences" in favor of the nonmoving party and must conclude not

whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson, 477 U.S. at 252, 255.

## IV.    DISCUSSION

Plaintiff Lauren Emmell brings this employment discrimination action against her former employer, Phoenix Hospital, under the FMLA, ADA, and PHRA. For the reasons that follow, I will grant summary judgment with respect to the plaintiff's FMLA claims (Counts I and II of her amended complaint), and I will deny summary judgment with respect to the plaintiff's ADA and PHRA claims (Counts III and IV).

### A.  Time Limitations

#### 1.  ADA and PHRA Timeliness

The plaintiff filed her charge of discrimination with the EEOC and the PHRC on January 2, 2014.[3] (Doc. No. 10 ¶ 13.) An EEOC charge must be filed within 300 days of the "alleged unlawful employment practice" if the individual has initiated proceedings with a state or local agency, or 180 days if it is not dually filed. 42 U.S.C. § 12117(a) (stating that enforcement procedures applied in Title VII claims also apply to ADA claims); § 2000e-5(e)(1) (establishing the limitation periods). Otherwise, the claim is time barred and the claimant cannot recover. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109, 114 (2002) (finding that

---

[3] In its motion for summary judgment, the defendant incorrectly lists this date as January 4, 2014. (Doc. No. 10 3–4.) This slightly impacts the calculation of the limitation period for ADA and PHRA claims.

the plaintiff could only file charges covering "discrete acts that 'occurred' within the appropriate time period").

"Each discrete discriminatory act starts a new clock for filing charges alleging that act." Morgan, 536 U.S. at 112. Discrete acts, such as "termination, failure to promote, denial of transfer, or refusal to hire" are easily identifiable, and those that are untimely are not actionable. Id. at 115. However, such time barred acts can be used as "background evidence" to support a timely claim. Id. at 112.

Because Pennsylvania is a "deferral state" and Ms. Emmell dually filed her charge of discrimination with both the EEOC and the PHRC, the 300-day limitations period applies to her ADA claim. See Mandel v. M&Q Packaging Corp., 706 F.3d 157, 165 (3d Cir. 2013). For her state PHRA claim, the limitations period is 180 days. Id. at 164 (citing 43 PA. STAT. AND CONS. STAT. ANN. § 959(h) (West 2018) ("Any complaint . . . must be so filed within one hundred eighty days after the alleged act of discrimination . . . .")); id. at 165 (stating that "the 300-day extended statute of limitations applies only to the [EEOC] Charge, not to the PHRA filing"); Craig v. Thomas Jefferson Univ., Civil Action No. 08-4165, 2009 WL 2038147, *3–7 (E.D. Pa. July 7, 2009) (applying the 180-day limitations period to the PHRA claim and the 300-day limitations period to the ADA claim).

Here, Ms. Emmell's ADA claims of unlawful employment practices that occurred after March 8, 2013 (300 days before the January 2, 2014 filing of her charge) can be heard, and her PHRA claims after July 6, 2013 (180 days before

January 2, 2014) can be heard. All claims of unlawful employment practices before those dates are time barred. See Mandel, 706 F.3d at 165. The termination of Ms. Emmell's employment, on July 12, 2013, can therefore be considered under both the ADA and the PHRA, along with any other allegedly unlawful employment actions that fall within the relevant statutory periods.

The plaintiff argues that her time-barred ADA and PHRA claims should be heard because they constitute continuing violations. (Doc. No. 34, at 6.) The continuing violations doctrine is an "equitable exception to the timely filing requirement." Cowell v. Palmer Tp., 263 F.3d 286, 292 (3d Cir. 2001) (quoting West v. Phila. Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995). This exception allows courts to grant relief for time barred acts where such acts are part of a "continuing practice." Id.

Courts do not consider discrete acts of discrimination a continuing practice; therefore they "cannot be aggregated under a continuing violations theory."[4] See O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006) (citing Morgan, 536 U.S. 101). O'Connor provides the following "non-exhaustive list" of discrete acts that independently trigger the limitations period: "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, wrongful accusation." Id. at 127. An employer's denial of a request for a reasonable accommodation also constitutes a discrete act

---

[4] An employer's time-barred acts may be considered as part of a hostile work environment claim because the nature of that cause of action requires aggregate proof. Morgan, 536 U.S. at 117. However, this case does not involve a hostile work environment claim.

of discrimination. <u>Mercer v. Se. Pa. Transit Auth.</u>, 26 F. Supp. 3d 432, 442 (E.D. Pa. 2014) <u>aff'd sub nom.</u> <u>Mercer v. SEPTA</u>, 608 F. App'x. 60 (3d Cir. 2015). This list of "discrete acts" encompasses all of the claims at issue in Ms. Emmell's amended complaint. (Doc. No. 10.) Therefore, I cannot consider her time-barred ADA and PHRA claims under a continuing violations theory. As stated above, I may only consider her ADA claims after March 8, 2013 and her PHRA claims after July 6, 2013.

## 2. FMLA Timeliness

The defendant argues that the plaintiff's claims of interference and retaliation under the FMLA are time barred. (Doc. No. 28, at 4; Doc. No. 10 ¶¶ 30–51.) FMLA claims must be brought no more than two years after "the date of the last event constituting the alleged violation." 29 U.S.C. § 2617(c)(1). However, if the employer's FMLA violation was willful, the limitations period extends to three years. § 2617(c)(2).

Here, Ms. Emmell filed her complaint alleging an FMLA violation on July 12, 2016. (Doc. No. 1.) Her employment had been terminated exactly three years prior, on July 12, 2013. The plaintiff does not dispute that unless she can prove willful action by the hospital, her FMLA claim is time barred but argues that the hospital acted willfully.

To establish willful action by an employer, a plaintiff "must show that the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." <u>Sommer v. Vanguard Grp.</u>, 380 F. Supp. 2d 680,

686 (E.D. Pa. 2005) (quotation mark omitted) (quoting Caucci v. Prison Health Servs., Inc., 153 F. Supp. 2d 605, 609 (E.D. Pa. 2001) (citing McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)). Employer negligence is insufficient to establish willfulness. Seifert v. Commonwealth of Pa. Human Relations Comm'n, 515 F. Supp. 2d 601, 613 (W.D. Pa. 2007) (citing Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 33–34 (1st Cir. 2003). In Seifert, the court found that evidence of hostility and negligence by the plaintiff's supervisor was insufficient to support a finding that "there was an intent to violate the FMLA or that defendant showed reckless disregard for whether its termination of plaintiff was prohibited by the FMLA." Id. at 615. "If an employer acts unreasonably, but not recklessly, in determining its legal obligation," it has not acted willfully. McLaughlin, 486 U.S. at 135 n.13.

Ms. Emmell argues that several interactions between her and Ms. Tannouri show that the hospital willfully violated the FMLA when it terminated her employment.[5] (Doc. No. 34, at 7–10.) First, the plaintiff notes Ms. Tannouri's testimony that she did not undergo training regarding her FMLA obligations. (Id. at 9.) Further, the plaintiff states that Ms. Tannouri "testified that she considered FMLA certifications to be, in her words, "meaningless.'" (Id., at 9.) However, this mischaracterizes Ms. Tannouri's testimony. At that point in her deposition, Ms. Tannouri was discussing the fact that employees do not have to disclose their

---

[5] In this portion of the plaintiff's response to the defendant's motion for summary judgment, she cites to her "Counter Statement of Undisputed Material Facts," which cite to deposition testimony. I will directly reference the deposition testimony cited in the relevant paragraphs of the plaintiff's counter statement because certain statements in the counter statement materially mischaracterize the deposition testimony.

medical conditions to the hospital or to a supervisor because a third-party company determines FMLA eligibility in order to maintain employee privacy. (Doc. No. 29 Ex. B at 163:21–164:4.) She went on to testify that every FMLA report she's seen qualifies employee's problem as a "serious health condition" and that this repetition renders the term "meaningless" because it does not convey the nature of the medical issue. (Id. Ex. B at 164:5–15.)

Viewing Ms. Tannouri's testimony in the light most favorable to the plaintiff, her lack of training constitutes negligence, at best. And her use of the word "meaningless" reflects callous disinterest, at worst.

The plaintiff states that Ms. Tannouri made "insensitive comments," including when she told Ms. Emmell to "get used to [the discipline] because there is more to come," which she allegedly said after Ms. Emmell explained that the PIP exacerbated her symptoms. (Doc. No. 34, at 9–10 (alteration in original).) This allegation is rooted in Ms. Emmell's deposition testimony, quoted here for context:

> **Q. And did Ms. Tannouri ever initiate a conversation regarding Lyme disease?**
> A. Is how are you feeling initiating a discussion on Lyme disease or not?
> **Q. So Ms. Tannouri would ask you how you're feeling?**
> A. Yes.
> **Q. And you did not believe that to be an appropriate question?**
> A. It might have been more appropriate if it was coming from a place of caring rather than trying to – what's the word – I'm thinking. It's hard to describe. When I told her that I was having more symptoms from my Lyme disease, that I felt like they were being increased by the pressure she was putting on me with the performance improvement plan [PIP], and she said well, get used to

it because there's more to come. Like, it's not going to get any better
or something to that effect. So I didn't feel it was a very
accommodating thing for a nurse manager to say knowing that I had
a medical condition that was impacting my performance. And
instead of being supportive, she was going to increase the pressure.

(Doc. No. 29 Ex. A at 90:24–92:2.)

While Ms. Tannouri's alleged words and actions toward Ms. Emmell may

have lacked warmth, even true hostility does not satisfy the standard for willful

action by an employer. See Seifert, 515 F. Supp. 2d at 615.

Lastly, the plaintiff argues that Ms. Tannouri "accused Plaintiff of

jeopardizing patient safety" after they discussed her symptoms, "told Plaintiff that

the symptoms of her disease 'didn't matter,'" and "accused Plaintiff of not

working well under pressure after Plaintiff confided in her that stress exacerbated

her symptoms."[6,7] (Doc. No. 34, at 10.) Taking all of this as true, it still does not

rise to the level of willful action by an employer. See Seifert, 515 F. Supp. 2d at

615 (stating that hostility cannot satisfy the standard for willfulness).

Considering all of this leads me to conclude that a reasonable jury could not

find that the hospital willfully violated the FMLA. Therefore, the plaintiff's

FMLA claims (Counts I and II of her amended complaint) are time barred, while

the plaintiff's ADA claims of allegedly unlawful activity after March 8, 2013 and

---

[6] The plaintiff notes that though these statements were made prior to her June 26, 2013 request for FMLA
leave, "they are very strong pieces of evidence that provide context to the ultimate decision by Defendants
to terminate Plaintiff a mere few days after she made the FMLA request." (Doc. No. 34, at 10.)
[7] The plaintiff cites to paragraphs 53 and 55 of its counterstatement of material facts. This appears to be in
error. The relevant paragraphs 53 and 55 appear to be in its response to the defendant's statement of
undisputed material facts (and the relevant deposition testimony is cited therein).

PHRA claims of allegedly unlawful activity after July 6, 2013 (Counts III and IV of her amended complaint) may proceed.

### B. ADA and PHRA Claims[8]

Ms. Emmell alleges ADA claims of discrimination and retaliation in Count III of her amended complaint. (Doc. No. 10, at 9.) She alleges that the defendant discriminated against her by "failing to engage in the interactive process and provide her with reasonable accommodations" (Id. ¶ 53) and retaliated against her "for her complaints of unlawful discrimination and her requests for reasonable accommodation" (Id. ¶ 54).

As discussed above, only the plaintiff's ADA and PHRA claims after March 8, 2013 and July 6, 2013, respectively, may proceed. Claims of unlawful actions by the hospital before those dates are time barred.

### 1. A reasonable jury could find that Ms. Emmell requested accommodation and that the hospital failed to accommodate her.

The defendant argues that summary judgment is appropriate because the plaintiff did not request an accommodation, as required by the ADA. (Doc. No. 28, at 9.) Viewing the evidence in the light most favorable to the plaintiff, I must deny summary judgment on this issue because a reasonable jury could conclude that Ms. Emmell's actions constituted a request for accommodation.

---

[8] I will only analyze Ms. Emmell's ADA claim because the analysis applies identically to her PHRA claim, except for limitations periods discussed above. See Taylor, 184 F.3d at 306.

The ADA prohibits an employer from discriminating against a "qualified individual" with a disability. 42 U.S.C. § 12112. To establish a prima facie ADA discrimination case, a plaintiff must prove that she (1) is disabled within the meaning of the ADA, (2) is a "qualified individual," and (3) has suffered an adverse employment action because of her disability. Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004); Skerski v. Time Warner Cable Co., 257 F.3d 273, 278 (3d Cir. 2001). Under the ADA, a "qualified individual" can "perform the essential functions" of the position "with or without reasonable accommodation." § 12111(8). "Adverse employment decisions" include refusing to make reasonable accommodations for a plaintiff's disabilities. Colwell v. Rite Aid Corp., 602 F.3d 495, 504 (3d Cir. 2010) (quoting Williams, 380 F.3d at 761.) The requirement that an employer make "reasonable accommodations" encompasses both parties' engagement in an "interactive process" to determine which, if any, accommodations would prove effective. Id.

To prove that an employer failed to provide reasonable accommodations by failing to engage in good faith in an interactive process, a plaintiff must show that "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Id. (quoting Williams, 380 F.3d at 772.)

To fulfill the second requirement, the employee's request for accommodation does not need to be specific or contain "magic words." See Colwell, 602 F.3d at 506–07 (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 332 (3d Cir. 1999); Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 247 (3d Cir. 2006)). When the "'employer knows of the disability and the employee's desire for an accommodation, it makes sense to place the burden on the employer to request additional information' to determine whether a reasonable accommodation is available." Armstrong, 438 F.3d at 247 (quoting Taylor, 184 F.3d at 315).

Therefore, the employee has effectively requested accommodation when he or she has provided the employer with sufficient information to know of the employee's disability and desire for accommodation or when circumstances would cause a "reasonable employer to make appropriate inquires about the possible need for an accommodation." Colwell, 602 F.3d at 506 (quoting Taylor, 184 F.3d at 313) (internal quotation mark omitted).

Once the employee has provided this proper notice, under the third requirement, the employer must make a good faith effort to engage in an interactive process to determine a reasonable accommodation. Id. at 507. Then, under the fourth prong, a plaintiff must show that a reasonable accommodation in fact existed. Id. at 504.

In Taylor, the plaintiff was a school secretary with bipolar disorder who was hospitalized due to a psychotic episode at work. 184 F.3d at 302, 313. The

school had the following information: the hospital treating Taylor provided the school with a phone number to answer potential questions; the school required the plaintiff to submit medical documentation from her doctor; and Taylor's son provided diagnostic and treatment information to the school district and requested accommodations for his mother. Id. at 314. The Third Circuit found that this information constituted a request accommodation sufficient to "trigger the school district's duty to participate in the interactive process." Id. at 314–315 (reversing the district court's grant of summary judgment because there were genuine disputes regarding the school district's engagement in the interactive process).

Here, before proceeding with the substantive analysis, it is worth briefly clarifying the application of the statute of limitations to failure to accommodate claims. An employer's failure to accommodate is a "discrete act of discrimination" under the ADA. Mercer, 26 F. Supp. 3d at 441. Therefore, each failure to accommodate claim is "a separately actionable 'unlawful employment practice' akin to wrongful termination or failure to hire" and subject to the relevant statute of limitations. Id. In other words, the statute of limitations concerns itself with the timing of the *denial* of the request for accommodation, not with the timing of the *request* for accommodation, which is the issue addressed by the defendant on summary judgment in this case. See id. at 442.

Therefore, Ms. Emmell may bring failure to accommodate claims alleging "unlawful employment practices" that occurred after March 8, 2013 under the ADA and after July 6, 2013 under the PHRA—but her request for

accommodations, which the defendant argues is lacking, permissibly could have occurred before those dates.

The following are the facts, viewed in Ms. Emmell's favor, that could constitute a request for accommodation. Ms. Emmell informed Ms. Tannouri of her Lyme disease diagnosis on August 14, 2012, about a week after she returned from FMLA leave, which she took at Ms. Tannouri's suggestion. (Doc. No. 29 ¶ 33, 37–38.) Further, the plaintiff "told Ms. Tannouri that her work performance would improve if it were not for the stress caused by the terms of the [2012] PIP," which exacerbated her symptoms. (Doc. No. 33 ¶ 72.)

Additionally, on May 17, 2013, Ms. Emmell requested a transfer from the SPU to a position as a "Clinical Document Specialist," which does not require direct patient care. (Doc. No. 33a ¶ 39, Doc. No. 33 Ex. O.) At this time, Ms. Tannouri replied that she was not eligible for transfer because she was on a PIP. (Doc. No. 33a ¶ 40.)

Given the information conveyed by Ms. Emmell to her employer, which is highly comparable to the information conveyed in Taylor, a reasonable jury could find that Ms. Emmell requested an accommodation. See Taylor, 184 F.3d at 314. Therefore, I will deny the defendant's motion for summary judgment as to the plaintiff's ADA and PHRA failure to accommodate claims.

**2. A reasonable jury could find that the plaintiff engaged in protected activity.**

The defendant argues that summary judgment is proper on the plaintiff's ADA and PHRA retaliation claims because she did not engage in protected activity and has not established that she was disabled or that her disability led to her firing. (Doc. No. 28, at 10, 12.)

The ADA states that

> [n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).

ADA retaliation claims follow the familiar McDonnell Douglas Corp. v. Green burden-shifting framework that is used in the analysis of Title VII claims. Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 187 (3d Cir. 2003) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 (1973)). To establish a prima facie case of ADA retaliation, a plaintiff must establish (1) her engagement in a "protected employee activity," (2) "adverse action" by the employer,[9] and (3) "a causal connection between the employee's protected activity and the employer's adverse action." EEOC v. Allstate Insurance Co., 778 F.3d 444, 449 (3d Cir. 2015); Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir.1997).[10]

---

[9] If the plaintiff is arguing the claim under a "mixed-motives" theory, she must only show that the "unlawful motive was a 'substantial motivating factor' in the adverse employment action." Shellenberger, 318 F.3d at 187–88 (citing Watson v. Se. Pa. Transp. Auth., 207 F.3d 207, 215 (3d Cir.2000)).

[10] If the plaintiff establishes these elements, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action." Shellenberger, 318 F.3d at 187 (citing Krouse, 126 F.3d at 500). "If the employer satisfies that burden, the plaintiff must then prove that 'retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process.'" Shellenberger, 318 F.3d at 187 (citing Krouse, 126 F.3d at 501).

The defendant argues in its motion for summary judgment that the plaintiff has not "engaged in a protected activity." (Doc. No. 28, at 12.) Under the ADA, an employee has engaged in protected activity when they have "opposed any act or practice made unlawful [by the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." Allstate Ins. Co., 778 F.3d at 452 (citing 42 U.S.C. § 12203(a)). Allstate held that an employee's refusal to sign a release from liability for the company did not constitute protected activity. Id.

However, protected activity covers a swath of conduct much broader than submitting a formal complaint letter to an employer or the EEOC. See Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995) (citing Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir.1990)). In Barber, an age discrimination case, the plaintiff had written a letter to human resources expressing his dismay that someone "less qualified" was hired for a job that he had applied for. Id. at 697. The Third Circuit noted that it would examine "the message that [the employee] conveyed, and not the medium of conveyance." Id. at 702 (defining protected activity broadly but finding that the employee's letter was "just too vague).

A Second Circuit Title VII case cited by Barber stated that protected activity can include "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general,

and expressing support of co-workers who have filed formal charges." <u>Sumner</u>, 899 F.2d at 209.

Here, Ms. Emmell claims that she engaged in protected activity during her conversations with Ms. Tannouri and Ms. Strzlecki. (Doc. No. 23, at 25–26.) After her negative June 2013 evaluation by Ms. Tannouri, the plaintiff met with Ms. Strzelecki. (Doc. No. 33 ¶ 92, Ex. A 211:8–23; Doc. No. 33a ¶ 42.) She discussed "how Ms. Tannouri was handling her work performance issues and . . . whether Ms. Strzelecki thought Ms. Tannouri 'was appropriate and accommodating' to someone who had Lyme disease." (Doc. No. 33 ¶ 92; Doc. No. 33a ¶ 45.) She also requested a transfer to a different unit, notwithstanding the hospital's policy against transferring employees on PIPs. (Doc. No. 33 ¶ 92; Doc. No. 33a ¶ 45.) Additionally, she explained to Ms. Strzelecki that because of her illness she was struggling to meet Ms. Tannouri's demands. (Doc. No. 33a ¶ 44.)

Viewing the facts in the plaintiff's favor, a reasonable jury could find that the plaintiff's meeting with Ms. Strzelecki, and potentially other meetings as well, constitute protected activity.

**3. Under the ADA, Ms. Emmell does not need to prove that she suffers from a disability for her retaliation claim. For her ADA discrimination claim, a reasonable jury could find that she suffered from a disability.**

The defendant argues in its motion for summary judgment that the plaintiff's "disability discrimination claims stumble at the outset because there is

no evidence that she was disabled at the time any of the allegedly discriminatory acts took place." (Doc. No. 28, at 13.)

As this argument relates to the plaintiff's ADA retaliation claim, it is clearly established law that a disability is not required for a successful claim. See Shellenberger, 318 F.3d at 188 (citing Krouse, 126 F.3d at 498). "By its own terms, the ADA *retaliation* provision protects 'any individual' who has opposed any act or practice made unlawful by the ADA or who has made a charge under the ADA." Krouse, 126 F.3d at 502 (citing 42 U.S.C. § 12203(a)). Whereas the ADA *discrimination* provision protects a "qualified individual with a disability." Id. (citing 42 U.S.C. § 12112(a)). Therefore, the status of Ms. Emmell's disability is not dispositive to her ADA retaliation claim.

For purposes of her discrimination claim, there is a genuine issue of material fact as to whether Ms. Emmell is disabled. Under the ADA, a "disability" is a "physical or mental impairment that substantially limits one or more major life activities," "a record of such impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A–C). The ADA provides the following nonexhaustive list of major life activities: "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." § 12102(2)(A). Viewing Ms. Emmell's Lyme disease diagnosis and symptoms in light of the ADA's definition of "disability," I must conclude that

summary judgment is improper and there is a genuine issue of material fact as to whether she is disabled under the ADA.

### 3. Causation

The defendant argues that there was no causal link between Ms. Emmell's alleged disability and her employer's actions. (Doc. No. 28, at 17.) Causation is required for both discrimination and retaliation claims under the ADA. See Williams, 380 F.3d at 759, 761.

"The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific." Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir. 1997). Close "temporal proximity," between the protected status or action by the employee and the adverse action by the employer, is suggestive but not determinative of causation. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000). A causation determination is "not limited to timing and demonstrative proof, such as actual antagonistic conduct or animus," but can depend on inferences based on the record as a whole. Id. at 281.

The plaintiff's employment was terminated on July 12, 2013. (Doc. No. 29 ¶ 115.) She had met with Ms. Strzelecki sometime after her June 25, 2013 performance evaluation, less than a month before her termination. (Doc. No. 33 ¶ 92.) During this meeting, she complained about Ms. Tannouri's handling of her performance issues and requested a transfer. (Id. ¶ 92; Doc. No. 33a ¶ 45.) By this time, Ms.Strzelecki and Ms. Tannouri were aware of the plaintiff's Lyme disease

diagnosis. During the plaintiff's March 23, 2017 deposition, she described this meeting with Strzelecki, stating that she told Ms. Strzelecki that she "felt like Mary [Tannouri] should be trying to help me . . . instead of feeling like she was constantly criticizing me, and that it was very hard to deal with my illness and . . . jump through all these hoops." (Doc. No. 29 Ex. A, 211:12–17.) Because of the close timing between this meeting with Ms. Strzelecki and the plaintiff's firing, along with the plaintiff's ongoing problems and conversations with Ms. Tannouri, it is proper for a jury to determine whether Ms. Emmell has established causation for purposes of her discrimination and retaliation claims under the ADA and PHRA.

In conclusion, I will grant the defendant's motion for summary judgment, in part, as to the plaintiff's FMLA claims (Counts I and II), and will deny it as to the plaintiff's ADA claim (Count III) and PHRA claim (Count IV).

An appropriate order follows.